ESTATE OF JACK A. BENJAMIN, DECEASED, JOHN F. BENJAMIN, CO-EXECUTOR AND ALICE U. BENJAMIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5134–67.    Filed May 11, 1970.

*Arthur S. Rollin* and *Harry Thom*, for the petitioners.
*Lewis M. Porter, Jr.*, for the respondent.

### OPINION

FAY, *Judge:* Respondent determined a deficiency of $9,838.13 in the income tax of petitioners for taxable year 1961. The issues presented for decision are (1) whether petitioners are entitled to capital gains treatment upon the surrender of an annuity policy and receipt of the balance payable in a lump sum (under section 402 or section 403 of the Internal Revenue Code of 1954)[1] and (2) whether petitioners are entitled to a $5,000 exclusion from income under section 101 (b).

All of the facts have been stipulated and are found accordingly. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference.

Jack A. Benjamin (hereinafter referred to as Benjamin) and Alice U. Benjamin (hereinafter referred to as Alice) were husband and wife prior to Benjamin's death on February 27, 1961. Following Benjamin's death, John F. Benjamin was appointed executor of the Estate of Jack A. Benjamin, one of the petitioners herein. Alice was a resident of Glencoe, Ill., at the time of the filing of the petition in this case. A joint Federal income tax return for the taxable year 1961 was filed for Jack A. Benjamin, deceased, for the period ending February 27,

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

1961, and by Alice for the taxable year 1961 with the district director of internal revenue, Chicago, Ill.

The Uhlmann Grain Co. (hereinafter referred to as Uhlmann) established a pension plan trust for the benefit of its employees on October 11, 1945, known as the Uhlmann Grain Co. Employees' Pension Trust (hereinafter referred to as the Uhlmann Pension Trust). Benjamin was an employee of Uhlmann on that date and continued in the employ of Uhlmann until his death. The details of the pension plan are set forth in the trust instrument. The trust instrument was revised or amended five times during the course of its existence. The tax-exempt status of the trust as revised on December 8, 1945, as well as the qualified status of the pension plan under section 165(a) of the Internal Revenue Code of 1939, as amended, was confirmed by letter ruling dated December 19, 1945, from the office of the District Director of Internal Revenue, Chicago, Ill. Letter rulings were requested and secured by Uhlmann following each amendment to the trust instrument establishing the continued qualification of the plan and tax-exempt status of the trust.

The eligibility requirements for employee participation in the pension plan are set forth in the revised pension plan, amended on December 21, 1950, as follows:

*Eligibility of Employees:* The following employees of the Company shall be eligible for this Plan:

(A) Each employee of the Company who was a participant of the Plan immediately prior to the amendments thereof effected by this amendatory agreement shall continue to be a participant of the Plan, providing he elects to continue as such by executing and delivering to the Company the required documents and agreeing to make the contributions provided for by Section III. * * *

(B) Until October 31, 1951 each other employee shall be eligible to become a participant hereunder either as of November 1, 1950 or as of November 1, 1951, as the case may be, on which he shall first—

(a) have completed at least five years of continuous service;

(b) have attained the age of 25 years and has not reached the age of 65 years on the date of eligibility; and

(c) be actively employed by the Company on a full-time basis in the job classifications enumerated in Paragraph (D) hereof.

(C) After October 31, 1951 each other employee shall be eligible to become a participant hereunder either as of November 1, 1952 or as of the November 1 of any year after 1952, as the case may be, on which he shall first—

(a) have completed at least five years of continuous service;

(b) have attained the age of 25 years and has not reached the age of 55 years on the date of eligibility; and

(c) be actively employed by the Company on a full-time basis in the job classifications enumerated in Paragraph (D) hereof.

(D) The job classifications entitling employees to become participants in the Plan are as follows:

(1) Administrative or executive officers.

(2) Superintendents or assistant superintendents.

(3) Branch office managers or assistant branch office managers.

(4) Office or clerical personnel.

(5) Customer's men; and

(6) Telegraphers.

Former employees of Uhlmann Grain Company who are now, or present employees of said Company who in the future become, employees of Uhlmann Elevators Company of Texas, a Delaware corporation, or of Enid Elevator Company, a Delaware corporation, and all employees of Uhlmann & Benjamin, a co-partnership, doing business in Chicago, Illinois, shall, for the purposes of this Plan, be regarded as employees of the Company, and shall be eligible for the benefits of this Plan if they otherwise meet the requirements and qualifications above set forth.

\* \* \* \* \* \* \*

If a participant ceases to be eligible hereunder, his benefits shall be determined as of the date of the happening of one of the following:

(a) In the event of the retirement of such employee at normal retirement date, such employee having been continuously in the service of the Company until normal retirement date, he shall be entitled to receive a retirement income of such an amount as may be provided by the policy or policies then held by the Trustees on his life, and to be paid in such manner as may be determined in the sole discretion of the Trustees, in accordance with the powers herein granted to the Trustees in Section IX.

(b) In the event of termination of the employment of such employee, he shall be entitled to the same benefits or benefits as is provided for participants in Section X or Section XIV, as the case may be, subject, however, to the provisions of Section VII.

(c) In the event of the discontinuance of the Plan, such employee shall be entitled to receive the policy or policies on the life of said employee held by the Trustees, or cash value of such policy or policies.

(d) In the event of the death of such employee, the death benefit, if any, provided under the policy or policies on his life, shall be payable to the beneficiaries of the employee, as provided in Section VIII relating to the death benefits to be made available to beneficiaries of a participant.

Eligibility requirements of the revised pension plan (dated December 8, 1945) were similar to the requirements set forth in subparagraph (B) above. The 1950 amendment thus reduced the maximum age of employees eligible to participate in the plan after October 31, 1951, from 65 to 55.

The trust instrument as amended on or prior to November 15, 1955, further provides:

### SECTION III

Contributions:

A. As and when a participant shall elect to continue as a participant, or as and when an eligible employee who is not a participant shall elect to become a participant, as provided herein, he shall agree in writing with the Company to pay each year as his contribution to the Plan, and shall authorize and empower the Company to deduct during each year from any amount due and to become due as compensation, an amount equal to three per cent (3%) of his annual basic income or compensation but not more than one-half (½) of the current

annual cost of his benefit under the Plan; provided, however, that no participant shall be required to make contributions to the Plan in excess of SEVEN HUNDRED FIFTY DOLLARS ($750.00) in any year.

The amount so authorized to be deducted shall constitute the participant's contribution, and payment thereof to the Company shall be made each year from the year of his first becoming a participant, or from the year of his first electing to continue his participation under the terms of this amendment, as the case may be, until he ceases to be a participant or until his normal retirement date, which ever is the earlier. * * *

  *   *   *   *   *   *   *

B. Uhlmann Grain Company, Uhlmann Elevators Company of Texas and Uhlmann & Benjamin shall each contribute to the trust the normal cost for its respective employees who are participants in the Plan, less the amount of its respective employees' contributions.

## SECTION IV

Employee benefits:

A. Those participants who were participants of the Plan on October 31, 1950 and who elected to continue as such, shall be entitled to monthly retirement benefits at age sixty-five (65), or retirement age, for a period of ten (10) years, of TWENTY DOLLARS ($20.00) on annual basic incomes up to ONE THOUSAND FIVE HUNDRED SEVENTY NINE DOLLARS ($1,579.00), and one-twelfth (1/12) of thirty per cent (30%) of annual basic incomes in excess of ONE THOUSAND FIVE HUNDRED SEVENTY NINE DOLLARS ($1,579.00) and up to TWENTY FIVE THOUSAND DOLLARS ($25,000.00) with a maximum normal monthly retirement benefit of SIX HUNDRED FIFTEEN DOLLARS ($615.00), in accordance with the following schedule:

| Basic income | Monthly pension |
|---|---|
| 0 to $1,579 | $20. |
| $1,580 to $1,979 | $30. |
| $1,980 to $2,379 | $40. |
| $2,380 to $2,779 | $50. |
| $2,780 to $3,179 | $60. |
| $3,180 to $3,579 | $70. |
| $3,580 to $3,979 | $80. |
| $3,980 to $4,379 | $90. |
| $4,380 to $4,779 | $100. |
| $4,780 to $5,179 | $110. |
| $5,180 to $5,579 | $120. |
| $5,580 to $5,979 | $130. |
| $5,980 to $6,379 increasing by equal amounts of $399 to $25,000. | $140 increasing by equal amounts of $20 to maximum monthly pension of $615. |

B. Those employees of the Company who become eligible to participate in the Plan on and after November 1, 1950 and become participants under the Plan shall, subject to the provisions of the Plan, be entitled to receive monthly retirement benefits at age sixty-five (65), or retirement age, for a period of ten (10) years, of an amount equal to one-twelfth (1/12) of one percent (1%) (computed to the nearest Five Dollars ($5.00)) of his annual basic income for

each year of his participation in the Plan prior to his normal retirement date; provided, however, that the maximum monthly retirement benefit to which any such participant shall be entitled under this Plan shall be SIX HUNDRED FIFTEEN DOLLARS ($615.00), or one-twelfth (1/12) of thirty percent (30%) of his annual basic income, whichever is less the minimum monthly retirement benefit shall be TWENTY DOLLARS ($20.00).

### SECTION V

Retirement Age. The age of normal retirement for the purposes of this Plan shall be the policy anniversary nearest to the sixty-fifth birthday of the employee, as to all employees who have not attained the age of fifty-five years at the time they become eligible under the Plan. As to all employees who become eligible under the Plan after attaining the age of fifty-five years, the normal retirement age shall be ten (10) years from the time they are eligible under the Plan. At the request of the Company and with the employee's consent, a participant may continue in the service of the Company after normal retirement age in which event contributions of both the Company and the participant shall cease and, in the sole discretion of the Trustees, such participant's retirement income may be paid to him in addition to his then compensation or may be deferred until the date of his actual retirement, but no additional retirement income other than that provided for under the terms of the policy or policies purchased for such participant shall become payable by reason of any such deferment of payment of retirement income. In case of such deferment of retirement income of a participant the Trustees shall have the power to request the insurance company or companies to hold the proceeds of the policy or policies issued on the life of such participant and accumulate interest thereon during the period between normal retirement and actual retirement but not in excess of five (5) years and only for the period during which such participant continues in the service of the Company.

The Uhlmann pension plan was funded from its inception by the purchase of individual annuity policies for each participant. The revised plan as amended on or prior to November 15, 1955, provides:

### SECTION VI

Purchase of Policies: The Trustees shall purchase, with funds contributed by the employees and by the Company, or otherwise, received hereunder, individual retirement income policies or individual retirement annuity policies, or United States Government bonds or notes, for each employee eligible under the Plan, as and when they become participants, in order to provide a retirement income at retirement age applicable to such employee, as set forth in Sections IV and V hereof.

Prior to May 20, 1957, the rights of participating employees with respect to employer contributions vested at the rate of 10 percent per year for each year of participation in the plan. On May 20, 1957, shortly before termination of the trust, the plan was amended to provide for the immediate vesting of the interests of all participants under the plan.

Section VII, as amended, reads:

Vesting of Interest: Except as hereinafter otherwise specifically provided, all of the interest of each employee under this Plan shall immediately and completely vest.

The trust instrument further provides:

### SECTION XII

Discontinuance of Plan: In case of the discontinuance of this Trust for any reason, anything herein to the contrary notwithstanding, the interest of each employee under this Plan shall immediately and completely vest in his policy or in the United States Government bonds or notes to which he shall be entitled hereunder, and each such employee shall be entitled to the value of his said policy or United States Government bonds or notes under the Trust; provided, however, that the Trustees may in their sole discretion take out paid-up individual retirement income policies or paid-up individual retirement annuity policies, and their action in this respect shall be final and binding upon the employee. In the event of such discontinuance of the Trust, the Trustees shall apply all funds in their hands to the payment of premiums on all insurance or annuity policies held in the Trust in proportion to the annual premiums payable on the respective policies, or purchase United States Government bonds or notes therewith. The Trustees shall thereupon distribute the policies and/or other property to the employees entitled thereto hereunder. The determination and action of the Trustees in this respect shall be final and binding upon the employees.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### SECTION XIII

Refunds and Forfeitures: During the continuance of the Plan, all funds paid back to the Trustees by any insurance company, including all funds so paid back in excess of employees' vested interests on account of the termination of employment with the Company because of resignation, dismissal or for any other reason not provided for herein, shall be accumulated and used by the Trustees to pay premiums on all policies of employees during the current or next succeeding taxable year, or for the purchase of additional Government bonds or notes hereunder.

Section XVI of the trust instrument bars the use of income or corpus for purposes other than for the exclusive benefit of the employees or their beneficiaries. Further limitations were placed upon the funds or benefits which individuals constituting the 25 highest paid employees of the plan may receive from the trust upon termination of the plan within the first 10 years of its existence. Similar restrictions were included with respect to termination within the 10-year period commencing November 1, 1955.

Custody of the annuity policies purchased by the trust for the benefit of participants was vested in the trustees exclusively. Section XXII provides:

Custody of the Policies: The Trustees shall have sole custody of the policies or securities which are assets of the Trust. The Trustees shall secure a vault or safety deposit box for the safekeeping of any such policies or securities, and any expense in connection therewith shall be reimbursed to them by the Company. The Trustees shall have the ownership and control of all policies or securities issued in accordance with the terms and provisions of this Trust Agreement, and the Trustees shall exercise all incidents of ownership, custody and control in accordance with their sole discretion and without liability of any character whatsoever on account thereof.

On or about November 1, 1945, the trustees of the Uhlmann pension plan purchased a retirement annuity policy for the benefit of Benjamin from Mutual Benefit Life Insurance Co. of Newark, N.J. (hereinafter referred to as Mutual). A specimen of the annuity policy purchased on the life of Benjamin and other participants under the pension plan reads in part:

RETIREMENT ANNUITY
No.

### THE MUTUAL BENEFIT
### LIFE INSURANCE COMPANY
#### OF NEWARK, NEW JERSEY

In consideration of the payment of Premiums as hereinafter provided, hereby promises as follows:

If _____ (herein called the Annuitant) whose residence is set forth in the Application herefor, shall be living on _____ _____ (herein called the Retirement Date) there shall be payable at the Company's office in Newark, New Jersey, beginning on such date, a Monthly Income of _____ Dollars, during a period certain of ten years and during the after lifetime of the Annuitant. The provisions hereof relating to Settlement Option No. 5 are applicable to such Monthly Income.

In lieu of such monthly payments, the Company, if requested, will pay on the Retirement Date the sum of _____ Dollars (herein called the Cash Option).

Upon receipt of due proof of the death of the Annuitant, if that event shall occur prior to the Retirement Date and prior to a default in Premium payments, there shall be payable at the Company's office in Newark, New Jersey, a Death Benefit equal to the Premiums paid or the Reserve on this contract, whichever is the greater.

Any payment falling due hereunder shall be made to the person or persons designated in the Application herefor.

The provisions printed or written by the Company on the following pages are a part of this contract.

IN WITNESS WHEREOF, The Mutual Benefit Life Insurance Company has by its President and Secretary, signed this contract at the City of Newark, in the State of New Jersey, this _____ day of

|  | Secretary | President |
|---|---|---|
| Age_____ | Attest: | Registrar |

\*     \*     \*     \*     \*     \*     \*

#### NON-FORFEITURE

At the end of any contract year prior to the Retirement Date, during the whole of which this contract shall have been in force, or within three months from default in Premium payments, this contract may be surrendered to the Company at its office in Newark, New Jersey, for its Cash Surrender Value.

The Cash Surrender Value will be equal to any excess of the sum of (a) the Reserve on this contract and (b) any Dividends standing to the credit hereof over the sum of (i) any indebtedness to the Company hereon and (ii) an amount equal to the Monthly Income payment provided for on the first page hereof; which amount will be diminished proportionally after the first contract year so as to be eliminated at the end of the third contract year.

The annuity policy provided for six settlement options at retirement age in lieu of a lump-sum payment. This provision reads:

Upon written request, the Company will place an indorsement on this contract whereby the whole or any designated fraction of the amount payable in one sum at maturity to a Beneficiary who is a natural person taking in his or her own right, will be retained or applied by the Company in accordance with any one of the following Settlement Options and the provisions applicable thereto. * * *

Option 1. Retained until the death of the Beneficiary. * * *

\* \* \* \* \* \* \*

Option 3. Applied to provide payments during a period certain, not exceeding thirty years.

\* \* \* \* \* \* \*

If the right of withdrawal or commutation has not been withheld in the request for the Option, the amount held under Option 1 or 2 may be withdrawn, or the future payments certain under Option 3, 4, 5, or 6 may be commuted, upon receipt of a written request at the Company's office in Newark, New Jersey, within ninety days after the maturity of this contract or within thirty-one days after any anniversary thereof. * * *

Premiums due under the annuity policies were generally paid by the trust out of employer and/or employee contributions. With the exception of contributions of Benjamin amounting to $1,557, all premium payments on the annuity policy purchased for his benefit were funded by contributions of Uhlmann.

Benjamin was born December 15, 1887. Under the terms of the pension plan, his normal retirement age was thus November 1, 1955. On that date Benjamin's interest in the trust corpus became fully vested. The accumulated value of the annuity policy on November 1, 1955, was $26,914.66.

An agreement (hereinafter referred to as the retention agreement) dated November 1, 1955, was executed by the trustees of the Uhlmann Pension Trust requesting Mutual to retain or apply the proceeds of the annuity policy on the life of Benjamin, as set forth therein. This request was made pursuant to section V of the pension trust instrument, as amended November 15, 1955, quoted above. The portion of that section commencing with the words "At the request of the Company" was added on November 15, 1955, by corporate resolution adopting the fourth amendment of the pension plan. The added provision deals with continuation of employees in the service of the company after normal retirement age. The amendment was made effective November 1, 1955. The retention agreement reads in part:

THE MUTUAL BENEFIT LIFE INSURANCE COMPANY is hereby requested to retain or apply, in the manner set forth below, $26,914.66, being the proceeds of Retirement Annuity No. 15,346, Life of Jack A. Benjamin.

Maturing on Retirement Date

Retirement Date November 1, 1955.

\* \* \* \* \* \* \*

## I.

The sum mentioned above and interest shall, subject to the following provisions be accumulated until November 1, 1960, or until the death of Jack A. Benjamin prior thereto, interest being allowed at the rate of two and one-quarter per centum per annum, or at such higher rate as may be determined annually by the Company. * * * [The] Trustees under an Amended Trust Agreement dated December 8, 1945, between said Trustees and Uhlmann Grain Company, and others, shall have the right at any time during the lifetime of Jack A. Benjamin, and prior to November 1, 1960, * * * to withdraw the accumulated amount then retained, * * * The right to withdraw the accumulated amount then retained shall be withheld from Jack A. Benjamin.

## II.

Upon receipt of a written request from the aforesaid Trustees at any time after November 1, 1955, and prior to November 1, 1960, if Jack A. Benjamin be living, the accumulated amount shall, subject to the right of the Insurance Company to require three months' notice in writing, be retained or applied by the Insurance Company to provide payments in accordance with Settlement Option 2, 3, 4 or 5, as set forth on the other side hereof, based on the life of Jack A. Benjamin. Each payment under the Settlement Option elected will be made as it falls due to Jack A. Benjamin, if then living.

## III.

On November 1, 1960, if Jack A. Benjamin shall be then living, and if the right of withdrawal shall not have been exercised in accordance with Paragraph I, or if Settlement Option 2, 3, 4 or 5 shall not have previously been requested in accordance with Paragraph II, the accumulated amount then retained is to be applied to provide monthly payments during a period of Ten years in accordance with Settlement Option 3. Each payment under Settlement Option 3 is to be made as it falls due to Jack A. Benjamin, if then living.

\*    \*    \*    \*    \*    \*    \*

## V.

The right of withdrawal under the amount retained under Settlement Option 2, and the right of commutation under the amount applied under Settlement Option 3, 4 or 5, shall be withheld from Jack A. Benjamin.

The retention agreement is undersigned by the trustees of the pension trust.

The Uhlmann Pension Trust was terminated on October 31, 1957. On that date all right, title, and interest in the annuity policy on Benjamin's life, representing his entire interest in the pension plan, was assigned to him by the trustees. The annuity policies of other participants in the pension plan were similarly assigned to them upon termination of the trust. The accumulated value of Benjamin's annuity policy on October 31, 1957, was $28,664.76. The pension plan was qualified and the trust constituted a tax-exempt organization under sections 401(a) and 501(a) on this date and this status was not adversely affected by the termination. A final letter ruling to this effect was

issued by the district director of internal revenue, Chicago, Ill., on July 25, 1957.

On June 2, 1958, the retention agreement was modified to grant Benjamin the power, formerly withheld by the trustees, to request at any time the application of the accumulated amount of the policy to the payment of monthly benefits to him pursuant to option 3. The following paragraph was substituted for paragraph II of the original retention agreement:

Upon receipt of a written request from Jack A. Benjamin at any time prior to November 1, 1960, the accumulated amount shall, subject to the right of the Insurance Company to require three months' notice in writing, be applied by the Insurance Company to provide monthly payments during a period of ten years in accordance with Settlement Option 3, as set forth on the other side hereof. Each payment under Settlement Option 3 shall be made as it falls due to Jack A. Benjamin, if then living.

However, Benjamin did not exercise this power prior to November 1, 1960, at which time Mutual commenced payment of monthly installments to Benjamin pursuant to settlement option 3 under the provisions of paragraph III of the retention agreement. Prior to his death on February 27, 1961, Benjamin received four monthly payments totaling $1,262.31. The approximate dates of these payments were November 1, 1960, December 1, 1960, January 1, 1961, and February 1, 1961. Benjamin was an active employee of Uhlmann at the time of his death.

In 1961, several months after the death of her husband, Alice, the secondary beneficiary of the Benjamin annuity policy, surrendered the policy to Mutual in exchange for a lump-sum payment in the amount of $30,606.88, representing the commuted value of the 116 monthly payments remaining due under the policy. The total gain realized by Alice upon her receipt of the lump-sum payment was $30,312.19, the amount realized less the unrecovered cost to Benjamin of $294.69. The amount received by Alice represented the entire amount of Benjamin's interest remaining in the annuity policy. Petitioners reported $25,312.19 as capital gain on their joint Federal income tax return for the taxable year 1961. Petitioners computed their gain by reducing the net gain realized of $30,312.19 by $5,000 under section 101(b). Respondent determined a deficiency in the income tax of petitioners on the ground that the entire gain realized, including the amount of $5,000 claimed as an exclusion under section 101(b), was taxable as ordinary income.

The sole question presented is whether Alice's receipt of a lump-sum payment from Mutual with respect to the Benjamin annuity policy is taxable to petitioners as capital gain or as ordinary income. Respondent agrees that if the proceeds of the annuity policy are tax-

able as capital gains, Alice is also entitled to a $5,000 exclusion of income under section 101(b).

The facts of this case may be summarized as follows: Uhlmann, a closely held corporation, established a trusteed pension plan on October 11, 1945. Pursuant to the provisions of this plan, the Uhlmann Pension Trust purchased from Mutual an annuity policy for the benefit of Benjamin. The interests of all participants of the plan were likewise funded by the purchase of annuity policies. On November 1, 1955, Benjamin reached normal retirement age but remained an employee of Uhlmann until the date of his death. The trustees of the Uhlmann Pension Trust entered into a retention agreement dated November 1, 1955, with Mutual whereby Mutual was to retain the proceeds of Benjamin's annuity policy, with interest thereon payable at the rate of $2\frac{1}{4}$ percent per annum, for a period of 5 years, at the expiration of which Mutual was to apply the proceeds of the annuity policy toward the payment of a monthly annuity to Benjamin pursuant to settlement option 3. The trustees retained the power to request a prior application of the proceeds toward payment of the annuity in accordance with one of the settlement options specified in the policy. In 1957, for business reasons, Uhlmann terminated the pension trust and distributed the annuity policies held by the trust to the employee-participants under the plan. In 1958, the retention agreement was modified to grant Benjamin the power to request application of the proceeds of his annuity policy to the payment of a monthly annuity prior to expiration of the 5-year retention period. On November 1, 1960, pursuant to the retention agreement, Mutual commenced the payment of monthly installments to Benjamin in accordance with settlement option 3. On February 27, 1961, after receiving four monthly annuity payments, totaling $1,262.31, Benjamin died while in the employ of Uhlmann. Alice, the secondary beneficiary under the annuity policy, surrendered the annuity policy to Mutual in 1961 and received a lump-sum payment in the amount of $30,606.88 in complete discharge of Mutual's obligation under the annuity policy

Upon original brief, both petitioners and respondent assumed that section 402 governed the disposition of the instant case and as a result focused their arguments upon such section. Prior to the filing of reply briefs, however, the Court issued an order, with which both parties complied, directing the parties to consider also the applicability of section 403 to the facts of this case.

As a general rule, amounts distributed or made available to a distributee by an exempt employees' trust under a qualified annuity plan are taxable to the distributee as ordinary income. A limited exception to this rule is provided by sections 402(a)(2) and 403(a)(2) in the case of lump-sum distributions which meet the specific requirements

of those sections.[2] Where the total distributions payable with respect to an employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from service or on account of the death of the employee after his separation from service, amounts received (in excess of employee contributions) are treated as long-term capital gains.

The predecessor of section 402 (sec. 165 (b), I.R.C. 1939, as amended in 1942) accorded capital gains treatment to a distributee upon his receipt of lump-sum distributions from an employee *trust*. However, capital gains treatment was not granted to comparable lump-sum distributions made under qualified insured plans prior to 1954 because of the explicit reference to trusts in section 165 (b) of the 1939 Code. G.C.M. 25358, 1947-2 C.B. 90. The inequities and hardships which resulted from the difference in treatment between trusteed and nontrusteed plans prompted the enactment of remedial legislation in 1954 extending capital gains treatment to distributions under non-trusteed qualified annuity plans.[3] Section 403, closely analogous in

---

[2] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

    (a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

        \*        \*        \*        \*        \*        \*

    (2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *

SEC. 403. TAXATION OF EMPLOYEE ANNUITIES.

    (a) TAXABILITY OF BENEFICIARY UNDER A QUALIFIED ANNUITY PLAN.—

        \*        \*        \*        \*        \*        \*        \*

    (2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—

      (A) GENERAL RULE.—If—

        (i) an annuity contract is purchased by an employer for an employee under a plan described in paragraph (1) ;

        (ii) such plan requires that refunds of contributions with respect to annuity contracts purchased under such plan be used to reduce subsequent premiums on the contracts under the plan ; and

        (iii) the total amounts payable by reason of an employee's death or other separation from the service, or by reason of the death of an employee after the employee's separation from the service, are paid to the payee within one taxable year of the payee,

then the amount of such payments, to the extent exceeding the amount contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore paid to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. This subparagraph shall not apply to amounts paid to any payee to the extent such amounts are attributable to contributions made on behalf of the employee while he was an employee within the meaning of section 401(c) (1).

[The statutory references are to the Internal Revenue Code as it presently reads. Changes which were enacted subsequent to the taxable years in question do not affect the outcome of this case.]

[3] H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 43 (1954).

structure and purpose to section 402, was enacted to provide for the taxability of payments received under a qualified annuity plan. With slight variations in language, the provisions of sections 402 and 403 are substantially the same, the former applicable generally to distributions under qualified trusteed plans and the latter to qualified nontrusteed annuity plans. Both sections precondition capital gains treatment upon the payment of "total distributions payable" [4] within 1 taxable year of the distributee on account [5] of the occurrence of specified events.

Respondent argues in the instant case that petitioners have failed to satisfy the "total distributions payable" requirement of section 402. Respondent reasons that the 1957 assignment of the annuity policies to Benjamin upon termination of the trust constituted a "distribution" of Benjamin's entire interest in the trust corpus at that time. Thus, respondent argues, the subsequent receipt of a lump sum from Mutual under the annuity policy did not amount to the payment of "total distributions payable." While respondent recognizes that the assignment of the annuity policy to Benjamin in 1957 is not regarded, for purposes of treating such assignment as income, to Benjamin in that year, as "distributed or made available" within the meaning of section 402 (a) (1) (see sec. 1.402(a)–1(a) (2), Income Tax Regs.),[6] he nevertheless maintains that the annuity policy was "distributed" for purposes of section 402(a) (2) in 1957. Petitioners, on the other hand, argue that Benjamin's receipt of the annuity policy in 1957 and the later collection of proceeds thereunder by Alice in 1961 represent a deferred distribution from the trust of the "total distributions payable." Petitioners' argument is premised upon their refusal to regard the 1957 assignment of the annuity policy to Benjamin a "distribution" until the collection of the proceeds in 1961.

Petitioners cite section 1.403(a)–2(b) (2), Income Tax Regs.,[7] dealing with nontrusteed plans, in support of their position. It is clear from

---

[4] Sec. 403 employs the term "total amounts payable."

[5] Sec. 403 reads "by reason of" in place of "on account of."

[6] (2) If a trust described in section 401(a) and exempt under section 501(a) purchases an annuity contract for an employee and distributes it to the employee in a year for which the trust is exempt, the contract containing a cash surrender value which may be available to an employee by surrendering the contract, such cash surrender value will not be considered income to the employee unless and until the contract is surrendered. * * *

[7] (2) If more than one annuity contract is received under the plan, the capital gains treatment does not apply to any amount received on the surrender thereof unless all contracts under the plan with respect to a particular employee are surrendered either at the time of the employee's death or other separation from the service or death after separation from the service. Thus, if an employee receives two contracts on separation from the service and surrenders one of them in the year of separation and receives payments under the other until his death, the capital gains treatment is applicable to the balance paid to his beneficiary on his death if paid within one taxable year of the beneficiary. The amount received by the employee on surrender of the contract in the year of his separation from the service, however, would not receive capital gains treatment since the balance to the credit of the employee with respect to all amounts under the plan did not become payable at that time.

the provisions of such regulation that an anuity policy received under a nontrusteed annuity plan is not considered a distribution of total distributions payable until the surrender of the policy and the collection of proceeds thereunder. Respondent, claiming that the applicability of the regulations cited by petitioners must necessarily be restricted to nontrusteed plans, relies upon numerous revenue rulings. See Rev. Rul. 65–267, 1965–2 C.B. 141; Rev. Rul. 65–268, 1965–2 C.B. 143; and Rev. Rul. 55–298, 1955–1 C.B. 394. These rulings find support in section 1.402(a)–1(a)(6)(iv), Income Tax Regs. This regulation involves the situation of multiple distributions under a pension trust and provides in part:

The total distributions payable are paid within one taxable year of the distributees when, for example, a portion of such total is distributed in cash to one distributee and the *balance is used to purchase an annuity contract which is distributed to the other distributee.* * * * [Emphasis supplied.]

Thus, under the regulations, the receipt of an annuity policy upon retirement from a *trusteed plan* is regarded as a distribution of "total distributions payable" while the receipt of an annuity policy under a section 403 *annuity plan* is not considered such a distribution unless and until the proceeds are collected thereunder.

The pivotal question is therefore whether section 402 or section 403 is the governing section in this case. Respondent insists that section 402 is applicable, citing *Estate of George E. Russell,* 47 T.C. 8 (1966). The *Russell* case, involving the distribution of an annuity policy from a pension trust, denied capital gains treatment to the taxpayer on the ground that the separation-from-service requirement, common to both sections 402 and 403, had not been met. While the facts of that case plainly did not require a determination of the governing section, the Court expressly rested its decision upon the provisions of section 402.

Under the particular facts of the instant case, we consider section 403, rather than 402, to be the governing section. In our view, the assignment of the annuit⁀es to all participants under the pension plan in 1957 effected a conversion of the trusteed plan into a nontrusteed qualified annuity plan. Thus, the distribution in 1961 to Benjamin's widow constituted a distribution from a qualified annuity plan. Petitioners are therefore entitled to capital gains treatment under section 403 and the regulations thereunder.

Respondent, in his reply brief, concedes the legal possibility of a nontaxable conversion from a trusteed to a nontrusteed plan. See Rev. Rul. 55–427, 1955–2 C.B. 27, dealing with a nontaxable conversion from a nontrusteed to a trusteed pension plan. In this respect, no meaningful distinction can be drawn between the conversion involved in the above-cited ruling and the reverse situation of the instant case. See Mertens, Law of Federal Income Taxation, sec 25B.49, p. 171 fn.

5.10. The assignment of annuity policies to the participants of the Uhlmann Pension Trust in 1957, we think, gave rise to the qualified annuity plan described in section 403(a)(1). A qualified annuity plan is therein described as "a plan which meets the requirements of section 404(a)(2)." Section 404(a)(2) in turn defines a qualified annuity plan as one which meets the qualification requirements of section 401(a)(3) through (a)(8).[8] In determining whether such requirements have been satisfied, we have considered the annuity plan against the background of the prior trusteed pension plan. The annuity plan represents a mere continuation, in nontrusteed form, of the preexisting pension plan and as a result bears close resemblance to the prior plan. Such fundamental characteristics of the prior qualified pension plan as nondiscrimination in coverage and benefits within the meaning of section 401 (a)(3)(B) and (a)(4), for example, were carried over to the annuity plan in 1957. Accordingly, we have concluded that the annuity plan formed in 1957 does conform with the statutory requirements of qualification referred to above.

The respondent maintains, however, that the annuity distribution did not constitute a *plan* as defined in the regulations. Respondent argues first that the plan did not constitute a "written program" as required by section 1.401–1(a)(2), Income Tax Regs., which provides: "A qualified pension, profit-sharing, or stock bonus plan is a definite written program." The omission of the term "annuity plan" in subsection (a)(2) of the regulation is conspicuous and we believe intentional. Contrast subsection (a)(1) of the above-quoted regulation. The regulations thus require a written program only in the cases of pension, profit-sharing, or stock bonus plans. Apart from the written annuity policy agreements, no written program is required in the case of a nontrusteed plan, as we read the regulations. See Rev. Rul. 69–421, I.R.B. 1969–32, 9, pt. 2(f).

Respondent next points to section 1.401–1(b)(2) of the regulations which states that "The term 'plan' implies a permanent as distinguished from temporary program." Respondent claims that the annuity plan established in 1957 lacked permanency in that "the employer completely severed any connection with the annuity contracts, and there was no duty to pay any more premiums on the contracts." We believe that respondent has incorrectly construed the above-quoted regulation. The permanency requirement referred to in the regulations does not contemplate perpetual contributions or premium payments in the case of benefit oriented plans such as pension and annuity plans, as

---

[8] The statutory references in the text are to the Internal Revenue Code as it presently reads. Prior to 1963, the Code, as applicable to the taxable years in question, defined a qualified annuity plan as one which meets the requirements of sec. 401(a) (3), (4), (5), and (6). It is clear that plans which are qualified under the present law are also qualified under the Code as it read in 1961.

respondent suggests.[9] Pension and annuity plans provide for readily determinable benefits to their participants (see sec. 1.401–1(b)(1)(i), Income Tax Regs.) and once funded, further contributions are not required to maintain such plans. In fact, plans covering *former* employees only may also be qualified under the regulations although contributions would presumably have terminated in such case. Sec. 1.401–1(b)(4), Income Tax Regs. Pension and annuity plans are deemed temporary under the regulations when termination "within a few years after it has taken effect" evidences the absence of the good faith intention of the employer to benefit his employees exclusively and particularly where premature termination favors a person described in section 401(a)(3)(B).[10] See sec. 1.401–1(b)(2), Income Tax Regs. It is clear that the discontinuation of contributions after adequate and substantial funding has occurred does not necessarily disqualify the plan under the regulations. In the instant case, the prohibited discrimination did not take place upon the cessation of further funding since the termination of the trust admittedly did not adversely affect the qualified status of the preexisting pension plan.[11]

Respondent next contends that failure to add new employees may "lead to the plan becoming discriminatory in operation." We disagree. Where a plan satisfies the nondiscrimination requirements of section 401(a), the fact that it may eventually become discriminatory in operation does not preclude its present qualification. Respondent's contention is, in fact, plainly refuted by section 1.401–1(b)(4) of the regulations, cited above, which provides for the qualification of plans covering former employees exclusively.

Respondent's final argument with respect to the qualified status of the annuity plan involves the ability of the participants to redeem their annuity policies for the cash surrender value prior to normal retirement. Respondent argues that this power forecloses qualification under section 1.401–1(a)(2)(i), Income Tax Regs., since it does not properly defer compensation. This regulation describes a *pension plan* as a definite written program which is established to provide for the livelihood of employees or their beneficiaries after retirement. As indicated above, by its terms such regulation is applicable to pension rather than annuity plans.

More fundamentally, however, the annuity plan of the instant case is no different from the plan contemplated by section 403. Respondent has conceded upon reply brief, and we think correctly, that the

---

[9] Cf. Rev. Rul. 69–157, 1961–1 C.B. 115, dealing with discontinuance of contributions in the case of a qualified profit-sharing plan.

[10] See Goodman, "Assured Retirement Benefits," 48 Taxes 300 (May 1968).

[11] A letter ruling was issued to this effect on July 25, 1957, stating that the qualified status of the pension plan would not be adversely affected by the proposed termination.

ownership of the annuity policies comprising the nontrusteed plan described in section 403 would reside in the individual employees.[12] The employees of a section 403 plan would therefore possess the power to redeem their annuity policies for the cash surrender value at any time under the nonforfeiture provisions of the specimen annuity policy quoted in our findings. Barring a preretirement surrender of the annuity policy, however, such policy becomes payable at maturity date (referred to in the annuity policy as "retirement date"), at which time the employee becomes entitled to receive the monthly annuity stipulated in the policy if fully funded or a lesser amount if partially funded. Payments received under such policy upon retirement thus represent deferred compensation earned in prior years.

Accordingly, the lump-sum payment to Alice in 1961 constituted a distribution from a qualified annuity plan. Consequently, petitioners are entitled both to the benefits of section 403(a)(2) and to a $5,000 exclusion under section 101(b).

*Decision will be entered for the petitioners.*

[12] Cf. Rev. Rul. 56–673, 1956–2 C.B. 281, involving the status of a pension plan funded by the purchase of "retirement income endowment contracts," (as distinguished from "annuity contracts") prior to the execution of a written trust agreement.