T.C. Memo. 2013-10

UNITED STATES TAX COURT

THOUSAND OAKS RESIDENTIAL CARE HOME I, INC., ET AL.,[1] Petitioners
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  1448-10, 1480-10,          Filed January 14, 2013.
                  1481-10.

      R determined that a corporation's compensation packages for its owner-employees were unreasonable and disallowed deductions for compensation paid for the 2003 through 2005 tax years.

      Held:  The compensation packages paid to the corporation's owner-employees were reasonable and deductible under I.R.C. sec. 162, for the 2003, 2004, and 2005 tax years to the extent determined herein.  The compensation paid to the owner-employees' daughter, Grace-Ann Strick, was unreasonable.

_____

      [1]Cases of the following petitioners are consolidated herewith:  Thousand Oaks Residential Care Home I, Inc., docket No. 1480-10; and Robert A. Fletcher and Pearl Fletcher, docket No. 1481-10.  On December 15, 2011, we granted motions to change the captions in docket Nos. 1448-10 and 1480-10.

[*2]      Held, further, the corporation is liable for the I.R.C. sec. 4972 excise tax to the extent determined herein.  It is not liable for the I.R.C. sec. 6651(a)(1) and (2) additions to tax.  Ps are liable for a portion of the I.R.C. sec. 6662(a) penalties as redetermined in this opinion.


Matthew Taggart, Ryan Andrews, Michael B. Luftman, and Charles Kolstad, for petitioners.

Kris H. An, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WHERRY, Judge:  These cases are before the Court on petitions for redetermination of income tax and excise tax deficiencies, additions to tax, and penalties respondent determined for petitioners' 2002 through 2005 tax years.[2]

After concessions the issues remaining are:[3]

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the taxable years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Petitioners Robert A. Fletcher and Pearl Fletcher concede with respect to their personal Federal income tax returns that they are not entitled to a deduction for depreciation expenses of $5,800 reported on Schedules E, Supplemental Income and Loss, for each of the 2003, 2004, and 2005 tax years.  They also concede that they are not entitled to deduct certain taxes of $1,670, $1,605, and $1,714 for the 2003, 2004, and 2005 tax years, respectively, reported on Schedule E, and respondent

(continued...)

**[*3]**   (1) whether the compensation Thousand Oaks Residential Care Home I, Inc.

(TORCH), paid to Robert A. and Pearl Fletcher was reasonable under section 162

---

[3](...continued)
concedes that they are entitled to deduct those expenses on Schedules A, Itemized Deductions, for the applicable years.  The Fletchers concede that they are also not entitled to deduct other Schedule E taxes of $709, $668, and $1,916 for the 2003, 2004, and 2005, tax years, respectively, and respondent concedes that they are entitled to deduct those expenses on Schedule A.  The Fletchers concede that they are not entitled to deduct Schedule E insurance expenses of $520, $500, and $505 for the 2003, 2004, and 2005 tax years, respectively.  The parties agree that Schedule E warehouse rental income should be decreased by $1,200 and $2,400 for the 2003 and 2005 tax years, respectively.  The Fletchers concede that they received unreported rental income of $4,400, $6,000, and $5,800 for the 2003, 2004, and 2005 tax years, respectively.  The Fletchers concede that they are liable for the sec. 6662 accuracy-related penalty with respect to the disallowed Schedule E expenses and unreported 67 Erbes property rental income.

Petitioner Thousand Oaks Residential Care Home I, Inc., concedes that it is not entitled to deduct repairs and maintenance expenses of $2,954 for the 2003 tax year.  This petitioner concedes that it is not entitled to deduct rental expenses of $2,800 and $7,100 for the 2003 and 2005 tax years, respectively.  Respondent concedes that this petitioner is entitled to deduct taxes and licenses expenses of $19,198, $19,110, and $6,009 for the 2003, 2004, and 2005 tax years, respectively.  This petitioner concedes that it is not entitled to deduct expenses of $56 and $103 for the 2003 and 2005 tax years, respectively.  It also concedes that it is not entitled to other deductions of $26,464, $15,432, and $8,924 for the 2003, 2004, and 2005 tax years.  This petitioner concedes that it is not entitled to deduct advertising expenses of $45 or employee benefit programs expenses of $2,852 for the 2003 tax year.  Respondent concedes that this petitioner is entitled to deduct $20 for the disallowed contribution for the 2003 tax year, and this petitioner concedes that it is not entitled to deduct $150 of the same for the 2003 tax year.  This petitioner concedes that it is liable for the sec. 6662 accuracy-related penalty with respect to all of its concessions listed in this paragraph.

[*4] for the 2003, 2004, and 2005 tax years, including the pension plan contributions paid on behalf of Robert A. and Pearl Fletcher for the 2003 and 2004 tax years,

(2) whether the compensation TORCH paid to the Fletchers' daughter, Grace-Ann Strick, was reasonable under section 162 for the 2003, 2004, and 2005 tax years,

(3) whether TORCH is liable for excise tax of $44,710.90 and $91,128.30 under section 4972 for the 2003 and 2004 tax years, respectively,

(4) whether TORCH is liable for section 6651(a)(1) failure to file additions to tax of $10,050.95 and $20,503.87 for the 2003 and 2004 tax years, respectively,

(5) whether TORCH is liable for section 6651(a)(2) failure to pay additions to tax of $11,177.73 and $22,326.43 for the 2003 and 2004 tax years, respectively, and

(6) whether petitioners Robert A. and Pearl Fletcher are liable for the section 6662(a) accuracy-related penalty for the 2003, 2004, and 2005 tax years and whether TORCH is liable for the section 6662(a) accuracy-related penalty for the 2002, 2003, 2004, and 2005 tax years.

**[*5]**                    FINDINGS OF FACT

The parties' stipulation of facts and supplemental stipulation of facts, with accompanying exhibits, and the stipulations of settled issues are incorporated herein by this reference. At the time they filed their respective Tax Court petitions, the individual petitioners resided in California and the corporate petitioner maintained its principal place of business in California.

Robert and Pearl Fletcher's Background--Lighting the Torch

Dr. Robert A. Fletcher began his career as an accountant for the Salvation Army Grace Hospital in Windsor, Ontario. He received formal training by taking charter accountant's courses offered by an accountant's association in Windsor, Ontario. He then became the business manager of the office staff at Leamington Memorial Hospital in Leamington, Ontario. Dr. Fletcher then moved to the United States in 1962 and began working at Seaside Oil, which merged with Tidewater Flying A Oil Co. that then merged with Getty Oil Co. He then became the chief accountant for Getty Oil.

After leaving Getty Oil Dr. Fletcher decided to attend Cleveland Chiropractic College in Los Angeles. After graduation Dr. Fletcher became a California licensed chiropractor and began a chiropractic business in 1969.

[*6] Starting in 1974 Dr. Fletcher operated his chiropractic practice as an owner-employee of Robert A. Fletcher Chiropractic Corp., which was incorporated on October 30, 1974. Dr. Fletcher spent approximately 30 hours per week at his chiropractic practice until he retired from practicing chiropractic medicine in 1995.

Ms. Fletcher is a registered nurse. She went through three years of training at the Grace Hospital in Toronto and received a nursing degree in 1959. After receiving her nursing degree, Ms. Fletcher's first job was at Hotel Dieu Hospital in Windsor, Canada, working in the operating room for about six months. After that, she worked at Leamington Memorial Hospital in Ontario, where she ran the recovery room. After the Fletchers moved to California Ms. Fletcher began working at the St. Francis Hospital in Santa Barbara in the intensive care unit and in the labor and delivery room.

After a few years Ms. Fletcher then went to work at the Granada Hills Community Hospital, where she ran one of the shifts in the large extended care unit. Her duties there included: overseeing the nurse's aides, dispensing medication, writing all of the reports and recordings on patients' charts, overseeing lab results, calling doctors, taking orders, and interacting with patients' families.

**[*7]** <u>Thousand Oaks Residential Care I (Corporation)--Carrying the Torch</u>

On June 30, 1973, the Fletchers purchased a struggling corporation called Thousand Oaks Residential Care I from John and Edith Breen. Dr. Fletcher explained that they paid $25,000 and assumed the debt obligations of the corporation, which were several hundreds of thousands of dollars, including the real property mortgage.[4] The corporation owned and operated TORCH an assisted living facility in Thousand Oaks, California.[5]

Dr. Fletcher was the corporation's sole shareholder. From 1973 to 2005 the corporation's board of directors consisted of three members: Robert A. Fletcher, Pearl Fletcher, and Lorne Muth, Pearl Fletcher's brother.

Dr. Fletcher oversaw TORCH's general operations, handled its finances, and supervised its maintenance workers. He also performed substantial maintenance work himself. After Dr. Fletcher retired from his chiropractic practice in 1995 he

---

[4]Although Dr. Fletcher's testimony was that they paid $25,000 and assumed the debt obligations, the corporation's Federal Form 1120, U.S. Corporation Income Tax Return, page 4 balance sheet for 2005 shows a common stock balance of $24,000, and the record does not reveal any stock redemptions. We believe Dr. Fletcher's testimony that they initially paid $25,000 for the corporation.

[5]An assisted living center, also known as a residential care home or residential care facility, provides care and supervision to seniors above the age of 60 without skilled nursing services. A nursing home is a facility that provides rehabilitation and skilled nursing services.

[*8] worked full time for TORCH. Ms. Fletcher worked on and managed the assisted care personnel aspects of TORCH. She worked with residents, learned of their diagnoses, handicaps and illnesses, handled family matters, communicated with the nurses and nurses' aides, communicated with doctors and pharmacists, worked with dietitians, and supervised the housekeeping staff. The Fletchers received Forms W-2, Wage and Tax Statement, from TORCH reporting the following incomes:[6]

| Year | Ms. Fletcher | Dr. Fletcher |
|------|--------------|--------------|
| 1973-1983 | -0- | -0- |
| 1984 | $6,000 | -0- |
| 1985 | 13,000 | $12,923 |
| 1986 | 15,521 | 18,764 |
| 1987 | 26,769 | 29,077 |
| 1988 | 36,000 | 36,000 |
| 1989 | 36,000 | 36,000 |
| 1990 | 4,154 | 4,154 |
| 1991 | -0- | -0- |
| 1992 | 20,800 | -0- |
| 1993 | 20,800 | -0- |

---

[6]All amounts have been rounded to the nearest whole number. No Forms W-2 were presented for any year where the amount paid was "-0-".

| | | |
|---|---|---|
| **[*9]** 1994 | 23,331 | -0- |
| 1995 | 25,885 | -0- |
| 1996 | 26,500 | -0- |
| 1997 | 26,500 | -0- |
| 1998 | 26,500 | -0- |
| 1999 | 26,112 | 3,112 |
| 2000 | 25,072 | 19,669 |
| 2001 | 25,011 | 26,000 |
| 2002 | 129,030 | 130,000 |
| Total | 512,985 | 315,699 |

The corporation did not begin to cover its expenses and was losing money until the Fletchers had owned it for 18 months. The corporation paid all of its other employees at the market rate for their services. The corporation reported the following revenue information on its Forms 1120 for the 1987 through 2005 tax years:

| Year | Gross receipts | Taxable income | Depreciation expense | Taxable income before deprecation[1] |
|---|---|---|---|---|
| 1987 | $863,021 | $35,863 | $24,277 | $60,140 |
| 1988 | 864,899 | 24,754 | 31,133 | 55,887 |
| 1989 | 826,847 | (8,748) | 25,907 | 17,159 |
| 1990 | 679,545 | (28,066) | 15,636 | (12,430) |
| 1991 | 840,221 | 3,075 | 19,586 | 22,661 |

[*10]

| 1992 | 894,853 | (26,117) | 25,441 | (676) |
|---|---|---|---|---|
| 1993 | 957,930 | (8,463) | 31,601 | 23,138 |
| 1994 | 982,305 | 34,585 | 32,410 | 66,995 |
| 1995 | 1,066,006 | 22,767 | 20,702 | 43,469 |
| 1996 | 1,127,454 | 16,063 | 33,092 | 49,155 |
| 1997 | 1,169,540 | 22,903 | 18,346 | 41,249 |
| 1998 | 1,238,596 | 44,632 | 30,033 | 74,665 |
| 1999 | 1,265,554 | 81,916 | 12,980 | 94,896 |
| 2000 | 1,250,983 | 29,479 | 10,380 | 39,859 |
| 2001 | 1,327,452 | (27,516) | 15,546 | (11,970) |
| 2002 | 1,001,110 | 297,798 | 13,949 | 311,747 |
| 2003[2] | -0- | 925,640 | 1,072 | 926,712 |
| 2004 | -0- | (917,045) | -0- | (917,045) |
| 2005 | -0- | (3,943) | -0- | (3,943) |
| Total | 16,356,316 | 519,577 | 362,091 | 881,668 |

[1]The Court has derived this column of information from the reported taxable income and depreciation amounts on the Forms 1120.

[2]The facility was sold in 2002, and thereafter the corporation did not receive any gross receipts.

In July 2002 the corporation hired the Fletchers' daughter, Grace-Ann Strick, at $10 per hour. Beginning in October 2002 (after the sale of TORCH, see infra), the corporation paid Ms. Strick $2,000 per month.

**[*11]** Passing the Torch

On October 1, 2002, the corporation sold its sole asset, the assisted living facility, in an installment sale for $3,400,000 to Inga Jakobavich.[7] The corporation allocated the $3,400,000 sale proceeds as follows: (1) $83,000 to furniture, equipment and machines, (2) $17,000 to a 1999 Windstar Van, (3) $200,000 to goodwill, and (4) $3,100,000 to building and land. Ms. Jakobavich has owned and operated an assisted living facility called Hillcrest Royale Retirement Community (Hillcrest) since 1989. After the purchase Ms. Jakobavich changed the name from TORCH to Thousand Oaks Royale Retirement Community. Since 2003 Ms. Jakobavich has paid herself $240,000 a year as the owner-operator of Hillcrest.

When TORCH was sold it had about 85 residents and between 45 and 50 employees on staff. As part of the sale agreement, Dr. Fletcher entered into an interim lease back and management agreement starting on October 1, 2002, and ending on the earlier of April 30, 2003, or when Ms. Jakobovich obtained her own

---

[7]Ms. Jakobovich agreed to pay the following amounts: (i) $700,000 at 8% interest with a monthly payment of $5,402.71 from November 1, 2002, to October 1, 2007; and (ii) $2,120,000 at 7% interest with a monthly payment of $14,983.72 from November 1, 2002, to April 1, 2003, when the entire principal balance together with interest was due.

[*12] license. The Fletchers continued to work at TORCH for nine months following its sale.

After the Sale of TORCH

The corporation created a defined benefit plan (pension plan), effective January 1, 2003. The Fletchers and Ms. Strick were the only participants of the plan.

The corporation paid Dr. Fletcher Form W-2 wages of $200,000, $200,000, and $30,000 in 2003, 2004, and 2005, respectively. It also contributed $191,433 and $259,506 to the pension plan for the benefit of Dr. Fletcher in 2003 and 2004, respectively, for a total compensation package of $880,939. The corporation paid Ms. Fletcher Form W-2 wages of $200,000, $200,000, and $30,000 in 2003, 2004, and 2005, respectively.[8] It also contributed $191,433 and $198,915 to the pension plan for the benefit of Ms. Fletcher in 2003 and 2004, respectively for a total compensation package of $820,348.

The corporation's annual board minutes dated November 28, 2003, state: "Compensation to Administrators was approved for payment of back salaries that

---

[8]The Schedules E for 2004 and 2005 appear to mistakenly leave off the $200,000 and $30,000 of executive compensation for each of the Fletchers. The Fletchers do not dispute receiving this income, and their accountant explained at trial that the expense for the Fletchers' compensation was included in the cost of labor elsewhere on the return.

**[*13]** were not paid in prior years due to insufficient cash flow." The corporation's annual board minutes dated November 26, 2004, reiterated that the salaries approved in the prior year would remain the same, and the annual board minutes dated December 26, 2005, again state that the compensation paid to the Fletchers was intended as catchup compensation for inadequate compensation from prior years.

In 1987 the long-term debt of the corporation was $758,071. In 2002 the long-term debt was $16,228, but the corporation owed $141,167 to its shareholders. The corporation's 2005 Form 1120 page 4 shows that at the end of the year the corporation had assets of $151,734 in cash on hand, $200 in current assets, and $700,000 in mortgage and real estate loans. It also shows that the corporation had liabilities of $149,262 in loans from shareholders, $515,987 in mortgages, notes, bonds payable in a year or more, $24,000 in common stock, and $162,685 in retained earnings.

Ragnar Storm-Larsen's accounting firm, Storm-Larsen & Co., Inc., has prepared petitioners' returns and accounting records since the early 1990s. Mr. Storm-Larsen is an enrolled agent and has an M.B.A. degree from the California Lutheran University. It was Mr. Storm-Larsen's regular business practice to ask the taxpayer to review and approve a return before it was filed.

**[*14]** Dr. Fletcher approached Mr. Storm-Larsen when he believed that the sale of TORCH was imminent and that he and Ms. Fletcher would be paying a large amount of tax. Mr. Storm-Larsen researched catchup compensation and explained to Dr. Fletcher that if he had not been paid reasonable compensation in the past then he could make an adjustment and pay himself more. Mr. Storm-Larsen also advised Dr. Fletcher that a contribution to the pension plan was a benefit and that he could include it as compensation not previously received. Mr. Storm-Larsen advised the Fletchers that the compensation was reasonable.

Expert Report--Elizabeth Newlon, Ph.D.

Respondent commissioned Elizabeth Newlon, Ph.D., a senior consultant of National Economic Research Associates, Inc., to assess the compensation Dr. and Ms. Fletcher could reasonably expect for work performed at TORCH. Dr. Newlon has a B.S. degree in economics from Ohio State University and an M.A. degree and a Ph.D. in economics from Carnegie Mellon University. She is a published writer and has worked on discrimination, wage-and-hour, and wrongful termination suits and provided compensation estimates for medical directors.

In order to compare the Fletchers' compensation with the nationwide data available, Dr. Newlon first determined that Ms. Fletcher's responsibilities were those of a medical and health services manager and that Dr. Fletcher's

[*15] responsibilities were those of a general and operations manager, although she questioned "that there was a need for a full-time manager of this type".  Dr. Newlon then compared the Fletchers' compensation with that of individuals doing similar types of work at residential care facilities in California.

Dr. Newlon used labor rates from the Bureau of Labor Statistics' Occupational Employment Statistics program.  That data is available only for 2002-2010; therefore Dr. Newlon deflated the compensation back to 1973 using the average decrease in compensation year to year, working backwards from 2010 to 2002.  Dr. Newlon also adjusted the data to control for differences in the prevailing wages in California.  She increased the national figures using the ratio of the median California medical and health services manager wages for Ms. Fletcher and the median general and operations manager wages for Dr. Fletcher to the national median wages for those positions (which worked out to be 118% for both).  Dr. Newlon then decreased Dr. Fletcher's estimated compensation to reflect the amount she believed he was working, i.e. to 25% of the estimated amount for the years his tax statements stated that he worked 25% of his time at TORCH, 100% for the years after his retirement, and 25% for the years after the Fletchers sold TORCH.  The following table shows Dr. Newlon's conclusions as to reasonable compensation for the Fletchers:

| [*16] Year | Ms. Fletcher | % Mr. Fletcher Worked | Mr. Fletcher |
|---|---|---|---|
| 2003 | $61,622 | 25% | $6,952 |
| 2002 | 57,437 | Nov. - Dec. 25 | 2,614 |
| | | Jan. - Oct. 100 | 52,286 |
| 2001 | 55,111 | 100 | 56,526 |
| 2000 | 53,169 | 100 | 54,223 |
| 1999 | 51,296 | 100 | 52,014 |
| 1998 | 49,489 | 100 | 49,895 |
| 1997 | 47,746 | 100 | 47,862 |
| 1996 | 46,064 | 100 | 45,912 |
| 1995 | 44,441 | 100 | 44,042 |
| 1994 | 42,876 | 25 | 10,562 |
| 1993 | 41,365 | 25 | 10,132 |
| 1992 | 39,908 | 25 | 9,179 |
| 1991 | 38,502 | 25 | 9,323 |
| 1990 | 37,146 | 25 | 8,943 |
| 1989 | 35,837 | 25 | 8,579 |
| 1988 | 34,575 | 25 | 8,229 |
| 1987 | 33,357 | 25 | 7,894 |
| 1986 | 32,182 | 25 | 7,572 |
| 1985 | 31,048 | 25 | 7,264 |
| 1984 | 29,955 | 25 | 6,968 |
| 1983 | 28,899 | 25 | 6,684 |
| 1982 | 27,881 | 25 | 6,412 |

| | | | |
|---|---|---|---|
| [*17] 1981 | 26,899 | 25 | 6,151 |
| 1980 | 25,952 | 25 | 5,900 |
| 1979 | 25,037 | 25 | 5,660 |
| 1978 | 24,155 | 25 | 5,429 |
| 1977 | 23,304 | 25 | 5,208 |
| 1976 | 22,484 | 25 | 4,996 |
| 1975 | 21,691 | 25 | 4,792 |
| 1974 | 20,927 | 25 | 4,597 |
| 1973 | 20,190 | 25 | 2,205 |
| Total | 1,130,545 | | 565,005 |

Procedural Background

Respondent issued notices of deficiency on: October 21, 2009, for Dr. and Ms. Fletcher's 2003, 2004, and 2005 tax years; October 21, 2006, for Thousand Oaks Residential Home, Inc., for its tax years ended December 31, 2002, 2003, 2004, and 2005; and October 21, 2009, for Thousand Oaks Residential Care Home, for its tax years ended December 31, 2003 and 2004, showing income tax deficiencies and penalties of:[9]

_____

[9]All values have been rounded to the nearest whole number.

| **[*18]**  Petitioner | Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|---|---|---|---|
| Robert A. & Pearl Fletcher, docket No. 1481-10 | 2003 | $29,750 | $5,950 |
| | 2004 | 31,191 | 6,238 |
| | 2005 | 16,729 | 3,346 |

| Petitioner | TYE Dec. 31 | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|---|---|---|---|
| TORCH, docket No. 1480-10 | 2002 | $99,391 | $19,878 |
| | 2003 | 526,695 | 105,399 |
| | 2004 | 701 | 104 |
| | 2005 | 18,916 | 3,783 |

| Petitioner | TYE Dec. 31 | Deficiency | Additions to tax Sec. 6651(a)(1) and (2) | |
|---|---|---|---|---|
| TORCH, docket No. 1448-10 | 2003 | $44,711 | $10,060 | $11,178 |
| | 2004 | 91,128 | 20,504 | 22,326 |

OPINION

I.  Burden of Proof

The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper.  See Rule 142(a); Welch v. Helvering,

**[\*19]** 290 U.S. 111, 115 (1933).  However, pursuant to section 7491(a)(1), the burden of proof on factual issues that affect the taxpayer's tax liability may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue."  The burden will shift only if the taxpayer has, inter alia, complied with substantiation requirements pursuant to the Code and "maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".  Sec. 7491(a)(2).  Because we decide these cases on the preponderance of the evidence, we need not address who bears the burden of proof.

II.    Reasonable Compensation

Respondent contends that the compensation packages paid to the Fletchers were not reasonable under section 162 for the 2003, 2004, and 2005 tax years and disallowed deductions for all of the compensation.[10]  Petitioners contend that compensation paid in those years was reasonable and included catchup payments

_____

[10]On brief respondent raises the issue of whether the fact that the corporation made only two payments to the defined benefit plan included in the Fletchers' compensation package makes the plan a temporary rather than a permanent one under sec. 1.401-1(b)(2) Income Tax Regs.  Respondent never challenged the plan previously, and we decline to address this argument here, noting only that as petitioners correctly point out:  "[t]he permanency requirement referred to in the regulations does not contemplate perpetual contributions".  Estate of Benjamin v. Commissioner, 54 T.C. 953, 967 (1970), aff'd, 465 F.2d 982 (7th Cir. 1972).

**[\*20]** for prior years in which they were undercompensated.  In determining the reasonableness of compensation, we look at the compensation package as a whole, which includes salary and pension plan contributions.  Bianchi v. Commissioner, 66 T.C. 324, 330 (1976), aff'd, 553 F.2d 93 (2d Cir. 1977).

A.    Overview of Section 162(a)(1)

Section 162(a)(1) provides a deduction for ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered".  The deductibility of compensation is determined through a two-prong test:  the amount of compensation must be reasonable, and the payment must be purely for services rendered.  Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), aff'g T.C. Memo. 1971-200; sec. 1.162-7, Income Tax Regs.  We consider the reasonableness of the combined salary payments and the contributions to the defined benefit plan.[11]  See Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), aff'g T.C. Memo. 1986-407; Bianchi v. Commissioner, 66 T.C. at 333-334.

---

[11]Contributions to defined benefit plans are not generally deductible under sec. 162 unless they meet the requirements of sec. 404(a).  Sec. 404(a) incorporates the reasonable compensation standard of sec. 162.  See LaMastro v. Commissioner, 72 T.C. 377, 381-382 (1979).

**[*21]** B.     Catchup Compensation & Services Actually Rendered

Compensation for prior years' services is deductible in the current year as long as the employee was actually under compensated in prior years and the current payments are intended as compensation for past services. R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972). When the compensation was actually for prior years of service, it need not be reasonable in the year it was paid. Devine Bros., Inc., v. Commissioner, T.C. Memo. 2003-15. Therefore, we shall evaluate the Fletchers' compensation in its entirety. In order for an employer to deduct compensation under section 162(a)(1) the compensation packages need to be both reasonable and for services actually provided. Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362; sec. 1.162-7, Income Tax Regs.

The corporation's annual board minutes dated November 28, 2003, explicitly state: "Compensation to Administrators was approved for payment of back salaries that were not paid in prior years due to insufficient cash flow." The corporation's annual board minutes dated November 26, 2004, reiterated that the salaries approved in the prior year would remain the same, and we infer that this means that the board also intended those compensation packages as payment of back salaries for prior years. The corporation's annual board minutes dated December

[*22] 26, 2005, again state that the compensation paid to the Fletchers was for inadequate compensation from prior years.

We found the Fletchers' testimony that the compensation was intended as catchup compensation for prior years credible and, when viewed along with the corporation's annual board minutes, we find that the compensation was intended as compensation for each of the three years at issue, respectively, and as catchup compensation for prior services actually rendered. Now we must determine whether the catchup compensation was reasonable.

C.   Reasonableness of Payments

The reasonableness of the payments is considered with reference to five broad factors set forth in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), rev'g T.C. Memo. 1980-282. No single factor is dispositive. Id. at 1245. The relevant factors are: (1) the employee's role in the company; (2) a comparison of the employee's salary with salaries paid by similar companies for similar services; (3) the character and condition of the company; (4) potential conflicts of interest; and (5) internal consistency. Id. at 1245-1247.

The Court of Appeals for the Ninth Circuit, to which an appeal in these cases would lie absent stipulation to the contrary, adds an additional factor:   whether an independent investor would be willing to compensate the employee as he was so

**[*23]** compensated.  <u>Metro Leasing & Dev. Corp. v. Commissioner</u>, 376 F.3d 1015, 1019 (9th Cir. 2004), <u>aff'g</u> 119 T.C. 8 (2002).  The Court of Appeals notes that "the perspective of an independent investor is but one of many factors that are to be considered when assessing the reasonableness of an executive officer's compensation."  <u>Id.</u> at 1021.  The reasonableness of compensation is a question of fact to be determined on the basis of all the facts and circumstances.  <u>Pac. Grains, Inc. v. Commissioner</u>, 399 F.2d 603, 606 (9th Cir. 1968), <u>aff'g</u> T.C. Memo. 1967-7.

      1.     <u>Employee's Role in the Company</u>

This factor looks to the overall significance of the employee to the company.  <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1245.  "Relevant considerations include the position held by the employee, hours worked, and duties performed, <u>Am. Foundry v. Commissioner</u>, 536 F.2d 289, 291-292 (9th Cir. 1976), as well as the general importance of the employee to the success of the company".  <u>Id.</u>

The Fletchers were hands-on owner-operators of TORCH.  Although TORCH was only moderately profitable, the Fletchers explained that they bought the facility for very little cash (i.e., $25,000) plus assumed liabilities, when the revenues from the facility could not even cover its bills and that within 18 months they had turned it around.  Dr. Fletcher was the president and overall manager of

**[*24]** TORCH, and Ms. Fletcher was the head nurse and was in charge of personnel and resident relations. We find this factor weighs in favor of petitioners.

### 2. Comparison With Salaries Paid by Similar Companies

The next relevant factor is a comparison of the employee's salary with salaries paid by similar companies providing similar services. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; Hoffman Radio Corp. v. Commissioner, 177 F.2d 264, 266 (9th Cir. 1949).

Petitioners did not provide the Court with any evidence of employees of other companies providing similar services with the exception of Ms. Jakobavich, who testified that she has paid herself $240,000 a year as the owner-operator of Hillcrest since 2003. However, we know nothing of Ms. Jakobavich's job description, duties, hours, or the profitability of Hillcrest. Respondent presented an expert witness to compare the Fletchers' compensation with nationwide data.[12]

---

[12]We note that we evaluate expert opinions in the light of each expert's demonstrated qualifications and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by an expert's opinion and may accept or reject an expert opinion in full or in part in the exercise of sound judgment. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. at 561-562. We may also reach a determination of value based on our own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

**[*25]** Combining two of the tables supra, we can summarize respondent's expert's findings as to the adequacy of Dr. Fletcher's and Ms. Fletcher's compensation:

| Year | Ms. Fletcher (estimate) | Ms. Fletcher actual | Amount under-paid | Dr. Fletcher (estimate) | Dr. Fletcher actual | Amount under-paid |
|---|---|---|---|---|---|---|
| 2002 | $57,437 | $129,030 | ($71,593) | $54,900 | $130,000 | ($75,100) |
| 2001 | 55,111 | 25,011 | 30,100 | 56,526 | 26,000 | 30,526 |
| 2000 | 53,169 | 25,072 | 28,097 | 54,223 | 19,669 | 34,554 |
| 1999 | 51,296 | 26,112 | 25,184 | 52,014 | 3,112 | 48,902 |
| 1998 | 49,489 | 26,500 | 22,989 | 49,895 | -0- | 49,895 |
| 1997 | 47,746 | 26,500 | 21,246 | 47,862 | -0- | 47,862 |
| 1996 | 46,064 | 26,500 | 19,564 | 45,912 | -0- | 45,912 |
| 1995 | 44,441 | 25,885 | 18,556 | 44,042 | -0- | 44,042 |
| 1994 | 42,876 | 23,331 | 19,545 | 10,562 | -0- | 10,562 |
| 1993 | 41,365 | 20,800 | 20,565 | 10,132 | -0- | 10,132 |
| 1992 | 39,908 | 20,800 | 19,108 | 9,179 | -0- | 9,179 |
| 1991 | 38,502 | -0- | 38,502 | 9,323 | -0- | 9,323 |
| 1990 | 37,146 | 4,154 | 32,992 | 8,943 | 4,154 | 4,789 |
| 1989 | 35,837 | 36,000 | (163) | 8,579 | 36,000 | (27,421) |
| 1988 | 34,575 | 36,000 | (1,425) | 8,229 | 36,000 | (27,771) |
| 1987 | 33,357 | 26,769 | 6,588 | 7,894 | 29,077 | (21,183) |
| 1986 | 32,182 | 15,521 | 16,661 | 7,572 | 18,764 | (11,192) |
| 1985 | 31,048 | 13,000 | 18,048 | 7,264 | 12,923 | (5,659) |
| 1984 | 29,955 | 6,000 | 23,955 | 6,968 | -0- | 6,968 |

**[\*26]**

| | | | | | | |
|------|-----------|---------|---------|---------|---------|---------|
| 1983 | 28,899 | -0- | 28,899 | 6,684 | -0- | 6,684 |
| 1982 | 27,881 | -0- | 27,881 | 6,412 | -0- | 6,412 |
| 1981 | 26,899 | -0- | 26,899 | 6,151 | -0- | 6,151 |
| 1980 | 25,952 | -0- | 25,952 | 5,900 | -0- | 5,900 |
| 1979 | 25,037 | -0- | 25,037 | 5,660 | -0- | 5,660 |
| 1978 | 24,155 | -0- | 24,155 | 5,429 | -0- | 5,429 |
| 1977 | 23,304 | -0- | 23,304 | 5,208 | -0- | 5,208 |
| 1976 | 22,484 | -0- | 22,484 | 4,996 | -0- | 4,996 |
| 1975 | 21,691 | -0- | 21,691 | 4,792 | -0- | 4,792 |
| 1974 | 20,927 | -0- | 20,927 | 4,597 | -0- | 4,597 |
| 1973 | 20,190 | -0- | 20,190 | 2,205 | -0- | 2,205 |
| Total | 1,068,923 | 512,985 | 555,938 | 558,053 | 315,699 | 242,354 |

For the years for which a "-0-" appears in the above table, petitioners did not supply a Form W-2. The Fletchers credibly testified that for the years for which they did not have a Form W-2 from the corporation, the corporation did not have sufficient funds to pay them a salary, making a Form W-2 unnecessary. Respondent did not establish that the Fletchers received a salary in any of those years and failed to produce any further Forms W-2.

Looking at the above table, even respondent's own expert, whom the Court found knowledgeable, agrees that the Fletchers were underpaid in comparison with

[*27] data from a national survey.[13]  Using the data from this chart, respondent's expert shows that before the years at issue Ms. Fletcher was underpaid by $555,938 and Dr. Fletcher was underpaid by $242,354.

In the years at issue, as we determined above, Dr. Fletcher received a total compensation package of $880,939 and Ms. Fletcher received a total compensation package of $820,348 for services rendered.  After subtracting the amounts by which the Fletchers were underpaid in prior years as determined by respondent's expert, Dr. Fletcher's combined compensation for the years at issue was $638,585 and Ms. Fletcher's combined compensation for the years at issue was $264,410.

Respondent's expert, Dr. Newlon, used labor rates from the Bureau of Labor Statistics' Occupational Employment Statistics program to determine the figures represented in the table above.  That data for 2003 through 2005 shows that a combined compensation inflated for California wages and assuming full- time employment, would be $187,537.40 for Dr. Fletcher and $195,785.60 for Ms. Fletcher.[14]  Because of the large difference between the actual compensation and

---

[13]We note that Dr. Newlon did not account for the time value of money. Because the Fletchers were required to wait for compensation for prior years, their catchup compensation should also have been inflated for the time value of money.

[14]These figures were taken from a table included in Dr. Newlon's expert report that reported data from the Bureau of Labor Statistics' Occupational

(continued...)

**[*28]** respondent's expert's opinion, this factor weighs in favor of finding that the Fletchers' compensation was unreasonable.

### 3.　Character and Condition of the Company

Under this factor we analyze the character and condition of the company, focusing on the company's size, complexity, net income, and general economic condition. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

First, we note that one of the reasons the Fletchers determined to pay themselves catchup compensation is that in multiple years the corporation had insufficient cashflow and profit to pay them adequate compensation. However, the corporation's profitability is not the only indication of the character and condition of the company.

In 1987 the long-term debt of the corporation was $758,071. By 2002 the long-term debt had been reduced to $16,228, and the corporation owed $141,167 in loans from shareholders.[15] Had the Fletchers chosen to pay themselves higher salaries in years they chose to aggressively pay down the loans, the outstanding

---

[14](...continued)
Employment Statistics program. Dr. Newlon did not reach any conclusions for these numbers; however, she did not believe that the Fletchers were each fully employed by the corporation for each of years at issue.

[15]With stated capital of only $25,000 the corporation was thinly capitalized and some of the loans from shareholders might arguably in substance have been capital. Respondent has never raised this issue; consequently, we shall treat the "loans" as loans.

[*29] debt would have been higher when TORCH was sold and the Fletchers would have made less on the sale. Also, as we noted above, TORCH was only moderately profitable, but the Fletchers bought the facility when the revenues it generated could not even cover its bills and within 18 months had turned it around. Although the corporation was not profitable enough to pay the Fletchers in some years, the Fletchers paid down long-term debt, and upon purchasing TORCH, managed to make it profitable enough to pay its own bills and to command a substantial price when it was sold. Therefore we find this factor slightly favors petitioners.

### 4. Potential Conflicts of Interest

This factor focuses on any indicia that there may be a conflict of interest. Id. Primarily we are concerned whether a relationship exists between the employee and the company that may permit the disguise of nondeductible corporate distributions as salary expenditures. Id.

The Fletchers, as owner-operators who never received a dividend and who used all of the profits of TORCH's sale to pay themselves income, undoubtedly had a conflict of interest. Petitioners' opening brief agrees that "a conflict of interest clearly existed". With petitioners' concession we find that this factor weighs

**[*30]** against finding that the compensation the Fletchers received was reasonable and deductible under section 162.

### 5. Internal Consistency

"[E]vidence of an internal inconsistency in a company's treatment of payments to employees may indicate that the payments go beyond reasonable compensation." Elliotts, Inc. v. Commissioner, 716 F.2d at 1247. In most of the years before the years at issue, the Fletchers' compensation was indeed inconsistent with the payments to other employees, but the Fletchers discriminated against themselves. In years when the corporation experienced cashflow problems or was not profitable they took no, or very little, salary. Respondent correctly points out that during the years at issue the Fletchers had large salaries; however, as discussed above, we found that the Fletchers were paying themselves previously earned compensation for years in which they were under compensated. We find that this factor weights in favor of finding that the compensation the Fletchers received was reasonable and deductible under section 162.

### 6. Additional Factor: The Independent Investor

While we found supra that the Fletchers did intend the compensation as catchup compensation for prior services rendered, paying out compensation packages that deplete the rest of the corporation's assets denies the corporation's

[*31] equity owners a fair return on their capital investment. In Elliotts, Inc. v.

Commissioner, 716 F.2d at 1247, the Court of Appeals for the Ninth Circuit noted

that

> If the bulk of the corporation's earnings are being paid out in the form
> of compensation, so that the corporate profits, after payment of the
> compensation, do not represent a reasonable return on the
> shareholder's equity in the corporation, then an independent
> shareholder would probably not approve of the compensation
> arrangement. If, however, that is not the case and the company's
> earnings on equity remain at a level that would satisfy an independent
> investor, there is a strong indication that management is providing
> compensable services and that profits are not being siphoned out of the
> company disguised as salary. [Fn. ref. omitted.]

The Fletchers purchased TORCH for $25,000 in 1973, and the record does

not indicate if they paid in any additional amounts.[16] A reasonable investor would

expect to receive a return on this initial investment and would not approve of a

---

[16]The record does not reveal whether the Fletchers were personally liable for
the loans assumed upon the purchase of TORCH, which would warrant an increased
return on the investment. And the record does not indicate whether the Fletchers
contributed additional amounts to TORCH during the periods it could not cover its
bills. Because the record is so sparse as to additional paid-in capital, we will
assume that TORCH took loans from the shareholders and then repaid them when
there was money.

Also, as discussed supra note 4, Dr. Fletcher testified that the Fletchers paid
$25,000 and assumed the debt obligations when they purchased the corporation;
however, the corporation's Form 1120, page 4 balance sheet for 2005 shows a
common stock balance of $24,000, and the record does not reveal any stock
redemptions. We find Dr. Fletcher's testimony credible that they initially paid
$25,000 for the corporation.

[*32] salary package that entirely depletes the corporation's assets. Id. (20% return on equity "would satisfy independent investor"); L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187 (investor would have been happy with either 6% dividend return plus 10% growth in retained earnings or 20% growth in shareholders' equity).

As the cases above show, the Court has found a return on investment of between 10% and 20% tends to indicate compensation was reasonable.[17] A 10% return on $25,000 compounded annually for 31.5 years (1973-2005) is roughly $503,300, and a 20% return is $7,800,982.[18] Because TORCH was a small highly leveraged business purchased with a large amount of debt, a hypothetical investor in TORCH might be satisfied with a 10% return on this investment. Therefore the corporation should have had $503,300 left for distribution after payment of the

---

[17]We note that in June 1973 the prime interest rate was between 7.5% and 7.75% and that a 10-year Treasury note had a 6.46% interest rate. Because of the nature of TORCH an investor would have expected to earn a higher rate of return than the Treasury note.

[18]Although as explained in Miller & Sons Drywall, Inc. v. Commissioner, T.C. Memo. 2005-114, "this Court has generally calculated a corporation's ROE [return on equity] by dividing its net income after tax for a specific year by its shareholders equity" instead of using compound growth rates, we find that under the specific facts of these cases using compound growth rates paints a more accurate picture. As the table supra page 9 shows, the corporation had minimal income in most of the years it was in business and in both 2004 and 2005 had negative income.

**[*33]** compensation packages. Because the compensation packages did not leave enough of the corporation's assets to be paid back to the hypothetical investor as a return on investment, we find that this factor weighs against a finding of reasonable compensation.

### 7.    Conclusion

After reviewing each factor discussed above, we find that the compensation packages the Fletchers received as compensation for the 2003, 2004, and 2005 tax years were unreasonable. Taking into account the rate of return a reasonable investor would have expected, we find that the Fletchers were overpaid by a total of $282,615.[19] A reasonable investor would require at least this amount remain in

---

[19]We have found that the corporation should have had on hand $503,300 to pay the hypothetical investor, and the corporation had $162,685 in retained earnings at the end of the 2005 tax year. We disallowed Ms. Strick's compensation of $59,000 infra (that in substance amounted to a dividend or distribution to shareholders and a gift by them to their daughter), which increased the amount the corporation had left on hand. Therefore, the Fletchers were overpaid by a total of $282,615 (i.e. $503,300 - $161,685 - $59,000 = $282,615).

The Fletchers' combined total compensation for the years at issue was $1,701,287. Dr. Fletcher's combined compensation accounted for 51.8% of that amount, and Ms. Fletcher's accounted for 48.2%. Therefore we attribute $146,395 of the overpayment to Dr. Fletcher and $136,220 to Ms. Fletcher. Of Dr. Fletcher's combined compensation his salary accounted for 48.8% and the pension plan contribution accounted for 51.2%. Therefore we find that Dr. Fletcher was overpaid in salary by $71,441 (which is not deductible) and had a nondeductible pension plan

(continued...)

[*34] the corporation to be paid out to the investor as a return on the investment. We again note that the reasonableness of compensation is a question of fact to be determined on the basis of all the facts and circumstances. Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606.

III.    Compensation Paid to Grace-Ann Strick

Respondent contends that the compensation paid to Ms. Strick was not reasonable under section 162 for the 2003, 2004, and 2005 tax years. As discussed supra, section 162(a)(1) provides a deduction for ordinary and necessary business expenses, including reasonable compensation for services rendered. Under the two-prong test the amount of compensation must be reasonable, and the payment must be purely for services rendered. Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362; sec. 1.162-7, Income Tax Regs.

In July 2002 the corporation hired Ms. Strick at $10 per hour. The corporation was sold on October 1, 2002, and beginning in October 2002, the corporation paid Ms. Strick $2,000 per month.

_____

[19](...continued) contribution of $74,954. Of Ms. Fletcher's combined compensation her salary accounted for 52.4% and the pension plan contribution accounted for 47.6%. Therefore we find that Ms. Fletcher was overpaid in salary by $71,380 (which is not deductible) and had a nondeductible pension plan contribution of $64,840.

[*35] Petitioners contend that Ms. Strick was hired to handle third-party vendors and worker's compensation claims filed by former employees against the corporation. Petitioners provided documents related to worker's compensation claims filed by Paula Muriel and Amparo Villasenor to substantiate Ms. Strick's employment. Ms. Muriel's accident occurred on or about February 11, 2002, and was settled on or about March 21, 2002. As this was before Ms. Strick began working for TORCH, we do not find this evidence substantiates Ms. Strick's employment.

Petitioners also provided documents related to the claim filed by Amparo Villasenor. Mr. Villasenor was injured on or about May 13, 2000. Although the file is much more extensive than that of Ms. Muriel and it appears that petitioners hired and paid attorneys through 2003 to handle the appeal of the worker's compensation claim, Ms. Strick's name does not appear on any of the documents, and she did not testify at trial to explain what services she provided. On the basis of the preponderance of the evidence we find that all of the compensation paid to Grace-Ann Stick was not reasonable under section 162 for the 2003, 2004, and 2005 tax years and the corporation is not entitled to deduct it.

**[\*36]** IV.     Section 4972 Excise Tax

Because TORCH did not file Form 5330, Return of Excise Taxes Related to Employee Benefit Plans, respondent contends that the corporation is liable for excise tax of $44,710.90 and $91,128.30 under section 4972 for the 2003 and 2004 tax years, respectively.  Section 4972 imposes a 10% tax on any nondeductible contributions to qualified employer plans.  See Citrus Valley Estates, Inc. v. Commissioner, 99 T.C. 379 (1992), aff'd in part, remanded in part, 49 F.3d 1410 (9th Cir. 1995).  Because we found supra that a portion of TORCH's contributions to the pension plan was unreasonable compensation and therefore not deductible under section 162 (and thereby section 404), the 10% section 4972 excise tax applies to that extent.

V.     Section 6651(a)(1) and (2) Additions to Tax

Respondent contends that the corporation is liable for section 6651(a)(1) failure to file additions to tax of $10,050.95 and $20,503.87 for the 2003 and 2004 tax years, respectively.  As a general rule, "any person made liable for any tax * * * shall make a return or statement according to the forms and regulations prescribed by the Secretary."  Sec. 6011(a); see also Citrus Valley Estates, Inc. v. Commissioner, 99 T.C. at 462 (holding section 6651(a) is applicable to the failure to file a Form 5330).  Section 6651(a)(1), in the case of a failure to file a return on

**[\*37]** time, imposes an addition to tax of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25% in the aggregate.[20] The addition to tax will not apply if it is shown that such failure is due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1).

Respondent also contends that the corporation is liable for section 6651(a)(2) failure to pay additions to tax of $11,177.73 and $22,326.43 for the 2003 and 2004 tax years, respectively, because the corporation did not pay the excise tax due to be shown on Form 5330. Section 6651(a)(2) provides for an addition to tax of 0.5% per month up to 25% for failure to pay the amount shown on a return unless it is shown that the failure is due to reasonable cause and not due to willful neglect.

Petitioners contend that they reasonably relied on the advice of Mr. Storm-Larsen that the compensation package was reasonable and therefore deductible, thus TORCH need not file Form 5330. They argue that the failure to file and failure to pay were due to reasonable cause and not willful neglect. When Dr. Fletcher understood that after the sale of TORCH they would be paying a large amount of tax, he sought Mr. Storm-Larsen's advice. Mr. Storm-Larsen researched

---

[20]The sec. 6651(a)(1) addition to tax is reduced by the amount of the sec. 6651(a)(2) addition to tax for any month (or fraction thereof) to which an addition to tax applies under both sec. 6651(a)(1) and (2). See sec. 6651(c)(1).

[*38] catchup compensation and explained to Dr. Fletcher that if he had not been paid reasonable compensation in the past then he could make an adjustment and pay himself more. Mr. Storm-Larsen also told Dr. Fletcher that a contribution to the pension plan was a benefit and that he could pay himself for compensation not previously received. Mr. Storm-Larsen advised the Fletchers that the compensation was reasonable, which would therefore not require a Form 5330 filing.

The Supreme Court of the United States has explained that "Courts have frequently held that "reasonable cause" is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." United States v. Boyle, 469 U.S. 241, 250 (1985). We agree with petitioners that they reasonably relied on the advice of their accountant and TORCH is not liable for the section 6651(a)(1) and (2) additions to tax.

## VI.    Section 6662(a) Accuracy-Related Penalty

Respondent also contends that petitioners Robert A. and Pearl Fletcher are liable for the section 6662(a) accuracy-related penalty for the 2003, 2004, and 2005 tax years and petitioner TORCH is liable for the section 6662(a) accuracy-related penalty for the 2002, 2003, 2004, and 2005 tax years.

**[\*39]** Subsection (a) of section 6662 imposes an accuracy-related penalty of 20% of any underpayment that is attributable to causes specified in subsection (b). Respondent asserts that one or both of two causes justify the imposition of the penalty for each year: a substantial understatement of income tax and negligence. Sec. 6662(b)(1) and (2).

There is a "substantial understatement" of income tax for any tax year where, in the case of an individual, the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return for the tax year or (2) $5,000. Sec. 6662(d)(1)(A). In the case of corporations (other than S corporations or personal holding companies) the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return for the tax year or (2) $10,000,000. Sec. 6662(d)(1)(B).

Section 6662(a) also imposes a penalty for negligence or disregard of the rules or regulations. Under this section "'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). Under caselaw, "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g on this issue 43 T.C. 168

**[*40]** (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Regulations promulgated under section 6664(c) further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty. See Boyle, 469 U.S. at 251 ("Reliance by a lay person on a lawyer [or accountant] is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute.").

The caselaw sets forth the following three requirements in order for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the

**[*41]** adviser's judgment." See Neonatology Asscos., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting and with approval the above three-prong test), aff'g 121 T.C. 89 (2003).

With respect to the employment plan contributions, we find that petitioners actually relied on the advice of their accountant, who was a competent professional, and that they provided him with the necessary and accurate information. Therefore, petitioners are not liable for the section 6662(a) accuracy-related penalty related to the contributions.

However, as discussed supra, we found that the compensation paid to Ms. Strick was not for services actually rendered and therefore not reasonable compensation. We do not find that Dr. and Ms. Fletcher actually relied on the advice of their accountant with respect to those payments, and TORCH is therefore liable for the section 6662(a) accuracy-related penalty related to those amounts.

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, the Court concludes that they are meritless, moot, or irrelevant.

**[\*42]** To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.